**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONNA DAVIS JAVITZ,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **3:15-CV-2443** |
| | : | **(JUDGE MARIANI)** |
| **LUZERNE COUNTY, ROBERT LAWTON,** | : | |
| **Individually, and DAVID PARSNIK,** | : | |
| **Individually,** | : | |
| | : | |
| **Defendants.** | : | |

<u>**MEMORANDUM OPINION**</u>

I. Iɴᴛʀᴏᴅᴜᴄᴛɪᴏɴ

Here the Court considers Plaintiff's "Motion for a New Trial Under Federal Rules of

Civil Procedure, Rule 59a *and* Motion to Alter or Amend Judgment Under Federal Rules of

Civil Procedure, Rule 59e *and* Motion for Relief from Judgment Under Federal Rules of Civil

Procedure, Rule 60(b)(6)" (Doc. 265). Plaintiff is now proceeding *pro se* but was

represented at trial by Attorneys Mark Frost and Dylan Hastings with Mr. Hastings serving

as lead counsel. (*See* Doc. 231 ¶ 5.) Plaintiff brings this combined Motion based on her

assertion that she "was denied a fair trial as a result of counsels' misconduct, errors in

evidentiary rulings, Attorney Frost's hearing impairment and the Court's lack of

accommodation, procedural mistakes, bias of the jury, misconduct by jury members." (Doc.

278 at 3.) For the reasons that follow, the Court will deny Plaintiff's Motion.

## II. BACKGROUND

On December 21, 2015, Plaintiff filed the above-captioned action after she was terminated from her position as the Director of Human Resources of Luzerne County, Pennsylvania. (Doc. 1.) Plaintiff was hired for the position on August 4, 2014, and was terminated on October 26, 2015. (*Id.* ¶¶ 39, 72, 78.) The operative Complaint is Plaintiff's Second Amended Complaint filed on April 5, 2017. (Doc. 58.) The Second Amended Complaint contains four counts: Fourteenth Amendment procedural due process claim pursuant to 42 U.S.C. § 1983; First Amendment retaliation claim pursuant to 42 U.S.C. § 1983; state law claim for Violation of PA Whistleblower Act and Wrongful Termination in Violation of Public Policy; and state law claim forViolation of Legislative Enactments. (*Id.*) Defendants in the action are Luzerne County, Robert Lawton, County Manager for Luzerne County at all relevant times, and David Parsnik, Division Head for Administrative Services for Luzerne County at all relevant times. (*Id.* ¶¶ 2-4.)

In response to Defendants' Motion for Summary Judgment (Doc. 66), the Court issued a Memorandum Opinion (Doc. 108) and Order (Doc. 109) on March 29, 2018, granting Defendants' motion in part and directing the Clerk of Court to enter judgment in favor of Defendants on Plaintiff's Fourteenth Amendment due process claim and First Amendment retaliation claim. (Doc. 109 ¶¶ 2, 3.) The Court also dismissed Plaintiff's state law claims without prejudice pursuant to 28 U.S.C. § 1367(c)(3). (*Id.* ¶ 4.)

After the Court denied Plaintiff's Motion for Reconsideration Under Federal Rule of

Civil Procedure 59, Plaintiff appealed the Court's determination regarding the First

Amendment and Fourteenth Amendment claims.  (Docs. 113, 117, 118.)  The Circuit

Court's decision on the appeal contained the following summary of the case:

> In July 2014, Javitz was offered a position with Luzerne County as the Director of Human Resources. Her offer letter contained the terms of her employment, and described the job as: "Management Level, Non Union, **Exempt**, Regular Full Time,"  and that her position was "**at will**." Javitz signed and accepted the offer, and began employment on August 4, 2014.
>
> As Director of Human Services, Javitz was responsible for—among other duties—commencing the hiring process for vacant positions, negotiating contracts, dealing with employee complaints, responding to grievances, conducting investigations, and attending meetings. Once she began work, Javitz participated in two investigatory meetings with the American Federation of State, County, and Municipal Employees ("AFSCME"), which eventually resulted in ASFSCME filing an unfair labor practices suit in March 2015.

### A. Javitz's Allegations of Wiretapping

> Javitz claimed that a document filed in the ASFSCME lawsuit was a transcript of the investigatory meetings in which she participated. She suspected that a specific county employee, AFSCME union representative Paula Schnelly, had recorded the meeting without Javitz's consent—a crime under 18 Pa. Cons. Stat. § 5703.
>
> Javitz reported her concern to her supervisor, David Parsnik, who agreed that the meeting may have been recorded. The two met with the District Attorney, who indicated that she would refer the matter to the Office of the Attorney General due to a conflict of interest. Javitz claims that the County Manager, Robert Lawton, intervened and instructed the District Attorney to drop the matter, which Defendants deny.
>
> After reporting the matter, Javitz followed up with Parsnik and the County Solicitor about the status of the investigation multiple times.

After making this report to the District Attorney, Javitz alleges that county employees retaliated against her. She claims that her supervisor assigned work directly to her subordinates and cut her out of those and other assignments for which Javitz would have otherwise been responsible. She also cites her office's relocation in May of 2015 as an example, but the move was planned prior to her hiring.

Finally, on October 26, 2015, Javitz was fired. She was given no reason for her termination. *Id.* She requested a *Loudermill* hearing, but was denied. *Id.*

### B. County's Response

The County maintains that Javitz was fired because of her "conduct toward [county] unions, her refusal to follow through with hiring a Human Resources Business Partner [ (a vacant position in the Human Resources Department during Plaintiff's County employment) ], her failure to initiate policies, procedures and initiatives as directed[,] and [her handling of] issues with the employment application for a candidate for an assistant public defender position."

*Javitz v. County of Luzerne*, 940 F.3d 858, 861-62 (3d Cir. 2019) (internal citations omitted).

With its October 10, 2019, opinion, the Circuit Court affirmed the Court's ruling regarding the Fourteenth Amendment due process claim and remanded the matter for further proceedings regarding the First Amendment retaliation claim. As a result of the Third decision, the only claim before the Court was Plaintiff's First Amendment retaliation claim.

Trial was set to commence on the First Amendment retaliation claim on June 30, 2021. (*See* Doc. 198.) Plaintiff's Motion for Continuance of Trial was filed on June 24, 2021. (Doc. 231.) Plaintiff sought the motion based on the inability of Attorney Frost, who was lead counsel at the time, to attend the trial because of a sudden illness and

hospitalization. (*Id.* ¶¶ 2-3.)  Plaintiff averred that Attorney Hastings would serve as lead

counsel but that he needed more time to prepare for trial.  (*Id.* ¶ 5.)  The Court held a

telephone conference on June 24, 2021, in which Attorney Hastings participated on behalf

of Plaintiff and Attorney Mark Bufalino participated on behalf of Defendants.  (*See* Doc.

242.)  At the conference, the Court and counsel agreed that trial would commence on July

6, 2021.

Trial commenced on July 6, 2021, and ended on July 9, 2021.  Attorneys Hastings

and Frost represented Plaintiff.  Attorney Bufalino represented Defendants.  The jury

returned a verdict for Defendants on July 9, 2021.  (Doc. 251.)  The Clerk of Court entered

judgment in favor of Defendants on July 12, 2021.  (Doc. 252.)   Plaintiff filed the pending

Motions on August 9, 2021.  (Doc. 265.)

### III. Relevant Legal Standards

## A. Federal Rule of Civil Procedure 59(a)

"The court may, on motion, grant a new trial on all or some of the issues—and to any

party ... after a jury trial, for any reason for which a new trial has heretofore been granted in

an action at law in federal court." Fed. R. Civ. P. 59(a)(1) (A).  The Court may grant a new

trial "purely on a question of law;" or to correct a previous ruling "on a matter that initially

rested within the discretion of the court, e.g. evidentiary rulings or prejudicial statements

made by counsel;" or "because [the Court] believes the jury's decision is against the weight

of the evidence;" among other grounds.  *Klein v. Hollings,* 992 F.2d 1285, 1289–90 (3d

Cir.1993) (internal citations omitted). While the Court has wide discretion to order a new trial

to correct rulings that initially rested in its discretion, it has relatively narrow discretion to

overturn a verdict on the grounds that the verdict is against the weight of the

evidence. *Id.* This is because

> where no undesirable or pernicious element has occurred or been introduced
> into the trial and the trial judge nonetheless grants a new trial on the ground
> that the verdict was against the weight of the evidence, the trial judge in
> negating the jury's verdict has, to some extent at least, substituted his judgment
> of the facts and the credibility of the witnesses for that of the jury. Such an
> action effects a denigration of the jury system and to the extent that new trials
> are granted the judge takes over, if he does not usurp, the prime function of the
> jury as the trier of the facts.

*Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 90 (3d Cir.1960).

> Accordingly, the district court ought to grant a new trial on the basis that
> the verdict was against the weight of the evidence only where a miscarriage of
> justice would result if the verdict were to stand. Where the subject matter of the
> litigation is simple and within a layman's understanding, the district court is
> given less freedom to scrutinize the jury's verdict than in a case that deals with
> complex factual determinations.

*Williamson v. Consol. Rail Corp.,* 926 F.2d 1344, 1352 (3d Cir.1991) (internal citations and

quotations omitted).

## B. <u>Federal Rule of Civil Procedure 59(e)</u>

Federal Rule of Civil Procedure 59(e) allows for a motion to alter or amend the

judgment.  "A proper Rule 59(e) motion must rely on one of three grounds: (1) an

intervening change in controlling law; (2) the availability of new evidence; or (3) the need to

correct clear error of law or prevent manifest injustice."  *Wiest v. Lynch*, 710 F.3d 121, 128

(3d Cir. 2013) (quotation marks omitted).  Thus, when a jury errs as a matter of law, a Court

may rectify this error through a Rule 59(e) motion.  *Keifer v. Reinhart Foodservices,*

*LLC.* (*"Keifer II"*), 563 Fed.Appx. 112, 115 (3d Cir.2014); *see also United States v.*

*Fiorelli,* 337 F.3d 282, 288 (3d Cir.2003) ("A motion under Rule 59(e) is a 'device to

relitigate the original issue' decided by the district court, and used to allege legal error")

(quoting *Smith v. Evans,* 853 F.2d 155, 158–159 (3d Cir.1988)). However, "motions for

reconsideration should not be used to put forward arguments which the movant . . . could

have made but neglected to make before judgment."  *United States v. Jasin,* 292 F. Supp.

2d 670, 677 (E.D.Pa.2003) (internal quotation marks and alterations omitted) (quoting *Reich*

*v. Compton,* 834 F. Supp. 2d 753, 755 (E.D.Pa.1993) *rev'd in part and aff'd in part on other*

*grounds,* 57 F.3d 270 (3d Cir.1995)).  Because federal courts have a strong interest in the

finality of judgments, motions for reconsideration should only be granted sparingly.

*Continental Cas. Co. v. Diversified Indus.,* Inc., 884 F. Supp. 937, 943 (E.D. Pa.1995)

(citing *Rottmund v. Continental Assurance Co.,* 813 F. Supp. 1104, 1107 (E.D. Pa.1992)).

## C. Federal Rule of Civil Procedure 60(b)(6)

Federal Rule of Civil Procedure Rule 60(b) allows a court to "relieve a party or its

legal representative from a final judgment, order, or proceeding" for numerous reasons.

Subsections (1) through (5) provide specific grounds for relief.  Rule 60(b)(6) has been

described as the "catch-all provision" of Rule 60(b) that permits a court to relieve a party

from final judgment for "any other reason that justifies relief."

The Third Circuit has consistently admonished that "the Rule 60(b)(6) ground for relief from judgment provides for extraordinary relief and may only be invoked upon a showing of exceptional circumstances." *Coltec Indus., Inc. v. Hobgood*, 280 F.3d 262, 273 (3d Cir. 2002) (quoting *In re Fine Paper Antitrust Litig.*, 840 F.2d 188, 194 (3d Cir. 1988)). Relief under Rule 60(b)(6) should be granted only "where, without such relief, an extreme and unexpected hardship would occur." *Cox v. Horn*, 757 F.3d 113, 115 (3d Cir. 2014) (quoting *Sawka v. Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993)). "This is a difficult standard to meet." *Satterfield v. District Attorney Phila.*, 872 F.3d 152, 158 (3d Cir. 2017).

In addressing claims invoking Rule 60(b)(6), the Third Circuit employs a flexible case-by-case analysis that "takes into account all the particulars of a movant's case" before determining whether Rule 60(b)(6) relief should be granted. *Cox*, 757 F.3d at 122. The movant bears the burden of establishing entitlement to this extraordinary relief. *Id.*

## D. Harmless Error

Federal Rule of Civil Procedure 61 governs such motions and provides:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed. R. Civ. P. 61.

In *Goodman v. Pennsylvania Tpk. Comm'n*, 293 F.3d 655 (3d Cir. 2002), the Circuit

Court related "substantial rights" consideration in Rule 61 with the Court's previous

determination that "[i]n reviewing evidentiary rulings, 'if we find nonconstitutional error in a

civil suit, such error is harmless only if it is highly probable that the error did not affect the

outcome of the case.'" *Id.* at 667 (quoting *Glass v. Philadelphia Elec. Co.,* 34 F.3d 188, 191

(3d Cir.1994)).   *Goodman* summarized the appropriate inquiry to be "whether it is "highly

probable" that the jury would have reached the same verdict absent the alleged error. *Id.*

## IV. ANALYSIS

Plaintiff raises numerous grounds upon which she alleges she is entitled to the relief

requested which the court has categorized as follows: misconduct by opposing counsel;

misconduct by Plaintiff's counsel; jury misconduct; and Court errors. (*See* Doc. 278 at 8-

38.)  Defendants respond generally that because Plaintiffs failed to raise issues raised in

her Motion at trial or in a Federal Rule of Civil Procedure 50  motion, she has waived these

issues and cannot challenge them with the pending Motion.  (Doc. 280 at 7.)  In her reply

brief, Plaintiff contends that the Court should not consider the issues waived for two

reasons:

> 1. Defendants who objected via a Motion in Limine (MIL) to Plaintiff's
> participation as counsel in her own case should be precluded from arguing that
> Plaintiff waived her right to object to several issues now raised by Plaintiff who
> is now acting as her own counsel in this Motion seeking a New Trial.
>
> 2. An exception to the waiver rule should be granted in this case where Plaintiff
> by virtue of the MIL was prohibited from acting as her own counsel and where

counsel failed to object to fundamental and highly prejudicial errors resulting in
a miscarriage of justice.

(Doc. 285 at 5.)

"A party who fails to object to errors at trial waives the right to complain about them
following trial." *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) (citing *Murray v. Fairbanks Morse,* 610 F.2d 149, 152 (3d Cir.1979). The Third Circuit "has recognized an exception to waiver when 'counsel fail[s] to object to a fundamental and highly prejudicial error resulting in a miscarriage of justice.'" *Wilson v. Vermont Castings, Inc*., 170 F.3d 391, 395-96 (3d Cir. 1999) (quoting *Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 116 (3d Cir.1992)).

The Court rejects Plaintiff's first argument. Defendants timely filed their Motion in Limine to Preclude Hybrid Representation and supporting brief on March 13, 2020. (Docs. 147, 148.) With the Motion, Defendants sought to preclude Plaintiff from appearing both *pro se* and through counsel. (*See id*.) Defendants appropriately supported their request with relevant legal authority:

> It is well established that although an individual may appear before the court pro se, she cannot appear both pro se and through counsel. *Aluminum Shapes, Inc. v. Paul Frank Roofing & Waterproofing Co*., No. CIV. A. 9400202, 1994 WL 410507, at *2 (E.D. Pa. Aug. 5, 1994) (citing 28 U.S.C. § 1654) ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct cases therein.); *see also Move Organization v. City of Philadelphia*, 89 F.R.D. 521 (E.D. Pa. 1981) (holding that civil rights plaintiff may either appear pro se or through counsel, but he has no right to "hybrid representation").

(Doc. 148 at 3.)

On March 23, 2020, Plaintiff, proceeding *pro se*, filed a "Motion to Allow Plaintiff to File Motions in Limine and Motion for Extension of Time to File Briefs in Response to Defendant's Motion in LImine" (Doc. 160).[1] In the Motion, Plaintiff indicated that she intended to hire new counsel to represent her in this case and Defendants would not be prejudiced if the Court granted her motion which would allow time for new counsel to file motions in limine and respond to the then pending motions. (Doc. 160 ¶¶ 50-52.) The Court granted Plaintiff's Motion by Order of March 24, 2020, and allowed Plaintiff to file motions in limine and respond to Defendants' pending motions on or before May 22, 2020. (Doc. 161). Attorney Mark Frost entered his appearance on Plaintiff's behalf on April 13, 2020. (Doc. 166.) On May 20, 2020, Mr. Frost filed briefs in opposition to two pending motions in limine (Docs. 167, 168), but he did not respond to the Motion in Limine to Preclude Hybrid Representation (Doc. 147). Plaintiff did not seek any further extensions of time nor was there any motion to file a response *nunc pro tunc* after the extended filing period had elapsed. Therefore, pursuant to Local Rule 7.6 of the Local Rules of Court of the Middle District of Pennsylvania, Plaintiff was deemed not to oppose Defendants' Motion in Limine to Preclude Hybrid Representation (Doc. 147) and the Court granted the motion. (Docs. 202, 203.)

---

[1] Plaintiff's former counsel, Joseph E. Welsh and Philip D. Lauer, filed their withdrawals of appearance on March 18, 2020, (Docs. 158, 159) after the Court granted their motion to do so (*see* Docs. 146, 157).

Given this procedural history and the substance of Defendants' Motion in Limine to Preclude Hybrid Representation (Doc. 147), the Court finds no basis to preclude Defendants' counsel from arguing that Plaintiff waived her right to object to several issues raised by Plaintiff who is now acting as her own counsel.  First, Defendants' counsel did nothing improper in seeking to preclude hybrid representation—Mr. Bufalino did not, as Plaintiff assert, "ask[] the Court to preclude Plaintiff who is an attorney from representing herself during the trial in this case." (Doc. 285 at 5.)  Rather, he objected to her representing herself *at the same time* as she was being represented by counsel.  (*See* Docs. 147, 148.)  Plaintiff chose to be represented by counsel rather than proceed *pro se*, a choice which was hers to make and change at any time.  She cannot now blame another for a litigation path she chose, and her request to penalize Defendants' counsel for her choice is properly denied.

The Court also rejects Plaintiff's second argument in part given that she indirectly seeks to blame Defendants' counsel.  Contrary to the assertion that "Plaintiff by virtue of the MIL was prohibited from acting as her own counsel" (Doc. 285 at 5), as discussed above, Plaintiff *chose* to hire counsel to represent her.  The Court properly granted Defendants' motion and precluded hybrid representation—when the Court issued the Order granting Defendants' motion in limine, the Court concluded that "Plaintiff is properly precluded from acting as trial counsel in this matter because she is represented by counsel." (Doc. 202 at 5.)  With this Order, the Court simply recognized Plaintiff's choice and proceeded

accordingly.  Therefore, any suggestion in Plaintiff's second argument that anyone else is

responsible for her decision to be represented by counsel at trial rather than proceed *pro se*

is rejected.

Notwithstanding this determination, Plaintiff's request for an exception to the waiver

rule based on her "counsel's failure to object to fundamental and highly prejudicial errors

resulting in a miscarriage of justice" (Doc. 285 at 5) invokes the recognized exception to the

waiver rule set out above.  *See Wilson*, 170 F.3d at 395-96; *Fleck,* 981 F.2d at 116.  While

Plaintiff asks the Court to apply the exception "to address all of the issues Atty. Bufalino is

challenging under the rule" (Doc. 285 at 7),  the Court declines to categorically apply the

exception.  Rather, the Court will assess whether Plaintiff has identified highly prejudicial

errors which resulted in a miscarriage of justice.  The Court will also assess whether the

matters to which objection was made at trial (*see, e.g.*, Doc. 285 at 6) entitle Plaintiff to the

relief requested.

Before doing so, the Court will address Defendants' second claimed basis for waiver,

i.e., that Plaintiff has waived issues not raised in her Motion but raised for the first time in

her supporting brief (which was filed over one month later (*see* Docs. 275, 278).  (Doc. 280

at 15.)  The Court rejects this basis for waiver because Plaintiff was granted an extension of

time to file her supporting brief and she subsequently timely filed the supporting brief.  (*See*

Docs. 271, 275, 277, 278.)  Therefore, any matters raised in her supporting brief have not

been waived on the basis of Plaintiff's failure to raise them in the earlier-filed Motion.  The

Court will consider these matters to the extent appropriate as discussed in the preceding paragraph.

This conclusion does not apply to arguments or issues raised for the first time in Plaintiff's reply brief as these are properly deemed waived. *See, e.g., Loving v. FedEx Freight, Inc.*, Civ. A. No. 3:18-CV-508, 2020 WL 2306901, at *14 (M.D. Pa. May 8, 2020) (citation omitted). In her reply brief, Plaintiff for the first time raises the issue/argument that "Defendants' counsel engaged in misconduct when he violated the rules of professional conduct by denigrating, ridiculing Plaintiff numerous times throughout the trial." (Doc. 285.) This issue is deemed waived and will not be further considered by the Court.[2]

As set out above, Plaintiff has sought an all-inclusive exception to the waiver rule which the Court has rejected. Plaintiff recognized in her supporting brief that "an exception to the rule that a party is not entitled to receive a new trial for objections to evidence that he did not make at or prior to the initial trial exists when counsel fails to object to a fundamental and highly prejudicial error resulting in a miscarriage of justice." (Doc. 278 at 33 n.8.) This recognition shows that Plaintiff knew that, without a waiver exception for many of the issues raised in support of her claim for relief, she had to show that the claimed errors were "fundamental and highly prejudicial."

---

[2] In response to Defendants' waiver arguments, Plaintiff states that she covered the waiver issue in paragraph 113 of her Motion which asserts that "Plaintiff reserves the right to supplement this Motion to Alter or Amend Judgment after review of the entire trial transcript and charging conference transcript." (Doc. 285 at 7 (quoting Doc. 265 ¶ 113).) No right reserved in the Motion applies to matters raised in Plaintiff's reply brief.

In seeking the exception for the first time in her reply brief, Plaintiff does not identify which claimed errors in the extensive list of claimed errors set out in her supporting brief are "highly prejudicial" and result in a miscarriage of justice.  In her supporting brief, Plaintiff states that "[a]ny one error or the totality of all errors committed at trial was highly prejudicial warranting reversal of the verdict."  (Doc. 278 at 8.)   Despite this general averment, Plaintiff in fact identifies four errors as "highly prejudicial" and states that "[t]he Court erred in making rulings on evidentiary issues that were highly prejudicial to Plaintiff's case" in three instances.  (*See id.* at 12, 18, 19, 33, 35.)   As with Plaintiff's claimed entitlement to a blanket exception of the application of the waiver rule, the Court rejects Plaintiff's general averment that all claimed errors were highly prejudicial and focuses on those specifically identified as such.  Thus, in the following review of claimed errors, the Court will focus on those errors identified as "highly prejudicial" and those to which objection was made at trial.

## A. Opposing Counsel Conduct

Plaintiff alleges the following misconduct by Defendant's counsel, Mark Bufalino, which allegedly denied her a fair trial:

> During his opening statement, Mark Bufalino made extraneous statements, improperly offered personal opinions, improperly testified as to his own credibility, repeatedly elicited improper testimony, made snide remarks about Plaintiff, repeatedly interrupted opposing parties' examination of witnesses, mischaracterized issues and evidence, engaged in improper impeachment, repeatedly exposed the jury to excluded evidence, [and] improperly referred to facts not in evidence.

(Doc. 278 at 8.)

15

In support of her assertion that she is entitled to a new trial, Plaintiff cites *Tesser v. Board of Educ. of City School Dist. of the City of New York*, 370 F.3d 314 (2d Cir. 2004), (Doc. 278 at 8) wherein the Second Circuit stated that "a party is entitled to a new trial when opposing counsel's conduct causes prejudice to that party ... thereby unfairly influencing its verdict."  370 F.3d at 321 (citing *Greenaway v. Buffalo Hilton Hotel*, 143 F.3d 47 (2d Cir.1998) (citing *Minneapolis, St. Paul & Sault Ste Marie Ry. Co. v. Moquin*, 238 U.S. 520 521 (1931))).  The Third Circuit has explained the issue of counsel misconduct as follows:

> [W]e recognize that not all improper remarks will engender sufficient prejudice to mandate the granting of a new trial. Our test is whether the improper assertions have made it "reasonably probable" that the verdict was influenced by prejudicial statements. *Draper* [*v. Airco, Inc.,* 580 F.2d 91, 97 (3d Cir. 1978)]. Often, as in the seminal case of *Draper,* a combination of improper remarks are required to persuade us of prejudicial impact. There we held that the combination of the following improprieties by plaintiff's counsel constituted grounds for a new trial:
>
>> 1) he attempted to prejudice the jurors through repeated inappropriate references to the defendants' wealth; 2) he asserted his personal opinion of the justness of his client's cause; 3) he prejudicially referred to facts not in evidence; and 4) without provocation or basis in fact, he made several prejudicial, vituperative and insulting references to opposing counsel.
>
> 580 F.2d at 95; *cf. Salas v. Wang,* 846 F.2d 897 (3d Cir.1988) (an isolated improper remark will not support the grant of a new trial); *Anastasio v. Schering Corp.,* 838 F.2d 701 (3d Cir.1988) (same). Despite a curative instruction, which came a day after the offending summation, we concluded in *Draper* that "it was more than 'reasonably probable' that the verdict was influenced by the prejudicial statements." *Id.* at 97. This conclusion was compelled by the argument as a whole rather than a single instance or type of impropriety. *Id.*

*Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 207–08 (3d Cir. 1992).

**1. Opening and Closing Statements**

No objection was made to Mr. Bufalino's opening or closing remarks.  However, Plaintiff identifies several instances of claimed misconduct during opening and closing statements as "highly prejudicial."  (*See* Doc. 278 at 12, 18, 19.)  Thus, the Court will consider whether the cited instances provide an exception to waiver because Plaintiff's counsel "fail[ed] to object to a fundamental and highly prejudicial error resulting in a miscarriage of justice.'"  *Wilson,* 170 F.3d at 395-96.

*a.  Opening Statement*

Plaintiff identifies the following statement Mr. Bufalino made during his opening statement as "highly prejudicial": "Mr. Hastings has told you that the evidence in this case is going to show that Mr. Parsnik bullied Ms. Javitz.  The only bullying that you're going to hear about in this case is about **how Donna Davis Javitz bullied every single person that came across her path**."  (Doc. 278 at 11 (quoting Trial Transcript ("T. Tr.") Day 1 85:24-25, Doc. 260 (emphasis added by Plaintiff)).)  Plaintiff asserts that this is highly prejudicial because "[t]here was no evidence offered by any witness to support this statement that Davis 'bullied every single person that came across her path.' This goes beyond the four reasons [given for her termination]. To the contrary, Lawton said Davis was an outstanding employee. Gazdzick praised Davis.  Parsnik praised Davis."  (Doc. 278 at 12 (citing T. Tr. Day 2 119:20-27, Doc. 261).)

Before being used by Mr. Bufalino, the word "bullied" had been used by Mr. Hastings in his opening statement when describing actions at the time of Plaintiff's termination: "So Donna packed up her stuff and she was fired.  Never knowing why she was fired, never got a reason, even though, she asked several times, over and over, they bullied her out of there, they just bullied her out of there."  (T. Tr. Day 1 77:23-24, Doc. 260.)   For Mr. Bufalino to pick up on Mr. Hastings statement and use the word "bullied" as he did in his opening statement cannot be considered highly prejudicial.  Plaintiff cannot credibly argue that there was no negative testimony about her demeanor with others.  (*See* Doc. 280 at 11-12 (citing Paula Schnelly, David Pedri, and Necia Gazdziak testimony)); *see also infra* pp. 22-23.  In speaking about the change in relationship between the County and unions after Plaintiff became HR Director, Ms. Schnelly, an administrative assistant for the local AFSME at the relevant time, testified that

> [u]pon meeting Ms. Javitz, things had changed completely. There was no longer the ability to carry on a civil conversation.
>
> . . . .
>
> Most of the time, if it was involving -- especially, in disciplinary meetings, the employees -- the union wasn't allowed to speak, first off, the employees were berated, belittled, intimidated, **she bullied them**, it was a very hostile situation.

(T. Tr. Day 2 194:7-9, 11-15, Doc. 261 (emphasis added).)  Thus, Mr. Bufalino's opening statement comment was realistically grounded in what he expected the evidence to show.

Even if "bullying" were not the most accurate description of other witnesses' negative testimony about Plaintiff's demeanor, the use of an imperfect descriptor in an opening statement is not highly prejudicial. Thus, this statement does not meet the test for an exception to the waiver rule.

This is the only opening statement excerpt identified as "highly prejudicial" in Plaintiff's supporting brief and the numerous other opening statement excerpts cited as error have therefore been waived. (*See* Doc. 278 at 8-18.) If the Court were to assume that some prejudice attached to the allegedly offending statements and that the waiver rule did not apply, the alleged errors do not meet the *Draper/Fineman* test that "the improper assertions made it reasonably probable that the verdict was influenced by prejudicial statements." *See supra* p. 16 (quoting *Fineman*, 980 F.2d at 207). This conclusion is based on the totality of the evidence presented at trial as well as the Court's instructions to the jury and statements made by counsel during opening and closing statements.

The allegedly prejudicial statements made on the first day of trial were preceded by the Court's preliminary instructions on the same day which specifically informed the jury that "[s]tatements [and] arguments . . . of the lawyers are not evidence." (T. Tr. Day 1 58:19-20, Doc. 260.) On the subject of opening statements, the Court instructed that "[w]hat is said in the opening statements is not evidence but is simply an outline to help you understand what each party expects the evidence to show." (*Id.* 65:10-12.) Mr. Bufalino reinforced the Court's instructions at the beginning of his opening statement when he said

> [t]his is the portion of the case which is called the opening statement. And as
> Judge Mariani alluded to you, earlier, opening statements are not evidence.
> And there's a reason why that's the rule. Because, sometimes, much like
> what you just heard, people say, This is what the evidence is going to be, and
> it isn't."

(*Id.* 79:20-25.)  He added that the opening statement is "our perception of what we hope the

evidence in this case will show to you." (*Id.* 80:11-12.)   In his closing argument, Mr. Bufalino

stated

> [w]e talked a little bit about, when I first got the chance to address you, that
> the opening statement was sort of like a road map about where we expected
> the evidence to take us. The closing arguments, just like opening statements,
> as Judge Mariani will tell you, are not evidence, they are my recollection and
> Mr. Hastings' recollection of what the evidence showed. Ultimately, though, it
> is your recollections and only your recollections that matter.

(T. Tr. Day 4 107:18-108:1, Doc. 263.)  After closing arguments, the Court reiterated that

"statements [and] arguments of the lawyers for the parties" are not evidence from which the

jury was to find facts.  (*Id.* 122:9-11.)   The Court also instructed the jury that "[t]he lawyers

may have called your attention to facts or factual conclusions they thought were important.

However, those arguments are not evidence and are not binding on you. It is your own

recollection and interpretation of the evidence that controls your decision in this case." (*Id.*

124:4-8.)

　　　　Given the nature of the allegedly improper statements and the fact that the jury was

instructed by the Court and warned by Defendants' counsel numerous times before and

after the statements were made that statements made by the lawyers were not evidence in

the case, the Court concludes that Plaintiff has not shown that she is entitled to relief based on Mr. Bufalino's conduct during his opening statement.

*b. Closing Statement*

Plaintiff identifies two aspects of Mr. Bufalino's closing argument to be "highly prejudicial." (Doc. 278 at 18, 19.)  She first points to the following statements made during closing argument:

> I respectfully submit, part of a desperate attempt to distract you from the realities in this case. [sic] (Doc 263, 113:9-11)

> Then we hear this **manufactured conversation**, between Lawton and Salavantis, that Lawton then goes to her and says, hey you know, I don't want that, I don't want that investigated. (Doc 263, 113:12-15)

> **She (Salavantis) took an oath not only when she took her office**, but when she stood up on that stand. She going to perjure herself as the chief law enforcement officer of the county? two term DA. (Doc 263, 113:16-22) She's going to sit up there and perjure herself in the federal courthouse in Scranton, in front of His Honor and you? (Doc 263, 113:24-25)

> **I respectfully submit it doesn't. And it didn't happen**. (Doc 263, 114:1-2)

(Doc. 278 at 18 (emphasis added by Plaintiff).)  Plaintiff asserts that "Bufalino's personally verifying the credibility of a witness without testifying in his case is highly prejudicial. The argument that she took an oath when she was sworn in is irrelevant and was not part of the evidence in this case. It also improperly refers to facts not in evidence." (*Id.* at 18-19.)

The Court concludes that Plaintiff has not shown that the identified statements are highly prejudicial such that an exception to the waiver rule would apply.  *Wilson*, 170 F.3d at 395-96.  As to the alleged conversation between Ms. Salavantis and Mr. Lawton, trial

testimony from both supports Mr. Bufalino's argument that the alleged conversation never took place. (T. Tr. Day 3 43:1-8, 114:12-20, Doc. 262.) Thus, it is not prejudicial for Mr. Bufalino to refer to the alleged conversation as a "manufactured" conversation. Nor is it prejudicial for him to point to reasons the jury should find Ms. Salavantis's testimony credible.

Plaintiff next points to Mr. Bufalino's statement concerning Kerry Gallagher, an AFSME union official who did not testify at trial: "They've got .. **Kerry Gallagher** asking for a meeting with Bob Lawton, **saying**, like what's up with your HR Director? What's the Problem? We may not have always agreed, but like it's getting ridiculous." (Doc. 278 at 19 (quoting T. Tr. Day 4 114:20-22, Doc. 263 (emphasis added by Plaintiff)).) Plaintiff asserts that this statement is highly prejudicial because "Bufalino is testifying and is referring to facts not in evidence." (Doc. 278 at 19.)

As with the statement regarding Ms. Salavantis, Plaintiff has not shown highly prejudicial error related to the statement concerning Ms. Gallagher. Plaintiff is correct that Kerry Gallagher did not testify in the case. However, Mr. Lawton testified that he had a meeting with Kerry Gallagher about union issues, specifically that "they took issue with the notion that Ms. Javitz would criticize the manner in which the union was representing its employees and her interactions with employees in those venues." (T. Tr. Day 3 51:13-52:10, Doc. 262.) It was not improper for Mr. Lawton to testify about the subject of the meeting. As indicated above, *see supra* p. 4, and at trial (*see, e.g.*, T. Tr. Day 2 99:19-24,

Doc. 261), problems with the unions was a reason provided for Plaintiff's termination and testimony about Plaintiff's relationship with the unions was deemed relevant (*id*. 99:14-18, 24-25). Union issues were the subject of extensive testimony. (*See, e.g.*, T. Tr. Day 2 4:6-5:16, 12:20-14:23, 94:22-95:2, 100:2-101:10; 142:8-23, Doc. 261.) Kerry Gallagher's involvement about complaints regarding Plaintiff's relationship with the unions was also the subject of testimony by witnesses in addition to Lawton. (*Id.* 156:21-24.) Paula Schnelly was present at the meeting with Gallagher and Lawton and testified about the subject of the meeting:

> Q. Tell me what was the subject matter of that meeting?
>
> A. The subject matter was Donna Davis.
>
> Q. In what particularity?
>
> A. That we could -- just the hostile environment, hostile situations every time we tried to meet, we could not resolve grievances, we could get nowhere.

(T. Tr. Day 3 207:22-208:2.)

The sum of this evidence shows that Mr. Bufalino's statement about "Kerry Gallagher asking for a meeting with Bob Lawton" is accurate. It also shows that Mr. Bufalino's characterization of Gallagher's reason for asking for the meeting ("what's up with your HR Director? What's the Problem? We may not have always agreed, but like it's getting ridiculous") is consistent with testimony regarding the relationship between Plaintiff and the unions. Thus, considering the statement in the context of the extensive evidence

concerning Plaintiff's relationship with the unions, the statement about Kerry Gallagher cannot be seen as highly prejudicial.

These are the only closing argument excerpts identified as "highly prejudicial" in Plaintiff's supporting brief and the numerous other closing argument excerpts cited as error have therefore been waived. (*See* Doc. 278 at 17-21.) If the Court were to assume that some prejudice attached to the allegedly offending statements and that the waiver rule did not apply, the alleged errors do not meet the *Draper/Fineman* test that "the improper assertions made it reasonably probable that the verdict was influenced by prejudicial statements." *See supra* p. 16 (quoting *Fineman*, 980 F.2d at 207). This conclusion is based on the totality of the evidence presented at trial as well as the Court's instructions to the jury and statements made by counsel during opening and closing statements. *See supra* pp. 19-20.

Therefore, just as the Court concluded about Mr. Bufalino's opening statement, based on the nature of the allegedly improper statements made during closing argument and the fact that it was made clear to the jury that statements made by the lawyers were not evidence, *see supra* p. 20, the Court concludes Plaintiff has not shown that she is entitled to relief based on Mr. Bufalino's conduct during his closing argument.

## 2. Other Matters

Plaintiff points to two additional matters related to Mr. Bufalino's trial conduct: he improperly raised questions about Plaintiff's 2019 wage information; and he frequently lodged objections that were not intended for proper purposes.  (Doc. 278 at 21-23.)

*a. 2019 Wage Information*

Regarding 2019 wage information, Plaintiff asserts that Mr. Bufalino's questioning of her vocational expert about the 2019 tax returns was prejudicial because "(1) it made Davis look like she was hiding something by not producing her 2019 tax returns, and (2) negatively reflected on her credibility when the scope of questioning was not fair because 2019 wage loss was not in issue."  (Doc. 278 at 22.)

The subject of the 2019 wage information first arose when Mr. Frost asked what materials Plaintiff's economic expert, Andrew Verzilli, had reviewed.

> I had Ms. Davis' resume that had her education and background and experience, I had her tax return information from 2015 to 2018, a W-2 form from 2019. I had some information regarding her salary with Luzerne County, and then I do have various economic data that I rely on, but in terms of what was provided -- regarding Ms. Davis, that was the information.

(T. Tr. Day 3 9:25-10:5. Doc. 262.)  On cross-examination, Mr. Bufalino asked about the information Mr. Verzilli had reviewed.  After talking about the 2015 through 2018 tax returns, Mr. Bufalino stated "[a]s I understand, you also had her 2019 W-2 form[.]"  (*Id.* 25:14.)  The following dialog then took place:

MR. FROST: Objection. We're not seeking any damages, Your Honor, as we stated yesterday, concerning 2019 going forward. So the fact that he had a W-2 for the 2019 from Ms. Davis, it would not be relevant.

MR. BUFALINO: I'm just trying to find out what he reviewed, Judge.

THE COURT: All right, I'll let you ask him what he reviewed. I do understand the Plaintiff's position here and I think you do, as well.

MR. BUFALINO: Yes, sir.

THE COURT: That their claim for pay, back pay, ends with 2018. Is that correct, Mr. Hastings?

MR. HASTINGS: That is correct, Your Honor.

MR. BUFALINO: Yes, Your Honor.

BY MR. BUFALINO:

Q. So you had the 2019 W-2?

A. Yes, sir.

(T. Tr. Day 3 25:15-26:6.)  2019 wage information was not mentioned again in the examination of Mr. Verzilli.

Defendants' economic expert, James Stavros, mentioned 2019 wage information when asked what material he had reviewed for his report, and the issue was dealt with similarly to the way it had been during Mr. Verzilli's testimony.  (*See* T. Tr. Day 4 12:7-13:3, Doc. 263.)  The Court concludes that these limited non-substantive references to 2019 wage information are not prejudicial in that, based on this dialog, no reasonable juror could

think that Plaintiff was "hiding something by not producing her 2019 tax returns, . . . [or that

it] negatively reflected on her credibility."  (Doc. 278 at 22.)

### b.  Frequency of Objections

Plaintiff next argues that

Mr. Bufalino frequently raised objections without having a reason for the objection, or was anticipating a question, was disruptive of the process and unnecessarily interrupted opposing counsel without allowing counsel to first complete the question. Bufalino objected 153 times during the trial; 58 objections were overruled, 68 were sustained, 27 were rephrased or withdrawn or answered. Plaintiff's counsel on the other hand objected a total of 35 times during this trial, 22 objections were overruled, 10 objections were sustained 3 were rephrased. Bufalino obviously intended to disrupt the trial and prevent the introduction of evidence damaging to Defendants' case. Fifty-eight objections were overruled. This constant interruption had a prejudicial effect on the jury. Jury was becoming annoyed, one or two were dozing off. Constant objections are unnecessary in that they "could antagonize the jury."  *Anheuser Busch, Inc. v. Natural Beverage Distributors*, 69 F.3D 337, 346 (9TH Cir. 1995).

(Doc. 278 at 23-24.)

The Court clearly instructed the jury about objections at the beginning of the trial and

after closing arguments on the last day of trial.  In the Court's preliminary instructions, the

Court stated: "You should not be influenced by the fact that an objection is made. You

should also not be influenced by my rulings on objections to evidence" (T. Tr. Day 1 59:15-

17, Doc. 260).  In the Court's jury charge following closing arguments, the Court advised the

jury at length on the subject of objections, including the following:

As I told you at the beginning of the trial, there are rules that control what can be received into evidence. You have heard a lawyer object when opposing counsel asked a question or offered an exhibit into evidence that the lawyer on the other side thought was not permitted by the Rules of Evidence or a prior

ruling. This simply means that the lawyer was requesting that I make a decision on a particular Rule of Evidence.

You should not be influenced by the fact that an objection was made. Objections to questions are not evidence. Lawyers have an obligation to their clients to make objections, when they believe that evidence being offered is improper, under the Rules of Evidence.

You should not be influenced by the objection or by the Court's ruling on it.

(T. Tr. Day 4 122:25-123:13, Doc. 263.)   Based on the foregoing, any prejudice possibly associated with objections lodged in this case would have been alleviated by the Court's instructions to the jury. [3]

Having previously found that Mr. Bufalino's opening and closing statements did not provide a basis for relief, the Court's findings regarding 2019 wage information and objection frequency end the analysis of alleged error related to Mr. Bufalino's trial conduct. With these alleged errors, viewed independently or together, Plaintiff has presented no basis to conclude that she is entitled to the post-trial relief requested based on Mr. Bufalino's trial conduct.

---

[3] Assessing the data presented by Plaintiff regarding objections, it is noteworthy that, viewed from a percentage perspective, the Court more often found that Defendants' counsel's objections were meritorious and Plaintiff's counsel's objections lacked merit. Defendants' objections were sustained 44% of the time and Plaintiff's objections were sustained 29% of the time; Plaintiffs' objections were overruled 63% of the time and Defendants' objections were overruled 38% of the time.  Further, any prejudice stemming from frequent objections could just as easily run against the party who lodges the greater number of objections as that party could be perceived to be culpable for the "constant interruption" and the source of the "[j]ury . . . becoming annoyed."  (Doc. 279 at 23).

## B. **Plaintiff's Counsel's Conduct**

Plaintiff maintains that she was prejudiced by Mr. Frost's conduct at trial such that she is entitled to a new trial. (Doc. 278 at 24-26, 27-32.) The Court rejects Mr. Frost's conduct as a basis for the relief requested.

Plaintiff does not cite any caselaw which supports the proposition that, in a civil context such as that presented here, a party is entitled to a new trial based on the conduct of her own counsel. The cases cited for the proposition that sleeping counsel in this case should support her request for a new trial do not provide the suggested support. (See Doc. 278 at 31 & n.6 (citing *Tippins v. Walker*, 889 F. Supp. 91 (S.D.N.Y. 1995); *Piskanin v. Cameron*, Civ. A. No. 11-CV-4698, 2014 WL 5316464 (E.D. Pa. Oct. 16, 2014); *Javor v. United States*, 724 F.2d 831 (9th Cir. 1984)).) *Tippins* is a 28 U.S.C. § 2254 habeas case considering trial counsel's sleeping during a substantial portion of a criminal trial which the criminal defendant alleged to be a *per se* violation of his Sixth Amendment rights. 889 F. Supp. at 91. *Piskanin* was decided in the habeas context and concluded that the petitioner had not provided any support for his allegation that he was prejudiced by his standby counsel who slept and snored during trial. 2014 WL 531 6464, at *14. *Javor* is a criminal case wherein the Ninth Circuit held that the conduct of defense counsel who slept through a substantial portion of the trial was inherently prejudicial under a Sixth Amendment ineffective assistance of counsel analysis because

> unconscious or sleeping counsel is equivalent to no counsel at all. The mere physical presence of an attorney does not fulfill the sixth amendment

entitlement to the assistance of counsel, *Holloway v. Arkansas,* 435 U.S. at 489, 98 S.Ct. at 1181, particularly when the client cannot consult with his or her attorney or receive informed guidance from him or her during the course of the trial. *Geders v. United States,* 425 U.S. 80, 88–89, 96 S.Ct. 1330, 1335–1336, 47 L.Ed.2d 592 (1976).

*Javor*, 724 F.2d at 834.

The rationale upon which *Tippins* and *Javor* were decided has no application here. Beyond the obvious that there is no right to counsel in a civil case and therefore no claim for ineffective assistance of counsel, here Mr. Hastings represented that he would be lead counsel (*see* Doc. 231 ¶ 5) so sleeping counsel (Mr. Frost) was not equivalent to no counsel and Plaintiff was free to consult Mr. Hastings throughout the trial. If Plaintiff was dissatisfied with Mr. Frost's conduct, she was free to terminate his representation at any time. Thereafter, she could have proceeded with Mr. Hastings as her counsel (which had been the plan as of the June 24, 2021, motion to continue and telephone conference (*see* Docs. 231, 242)) or terminated the representation of both Mr. Frost and Mr. Hastings and proceeded *pro se*. Plaintiff chose to continue with both Attorneys Frost and Hastings although her complaints about Mr. Frost's conduct include hearing issues which were apparent pretrial when Mr. Frost's hearing problem was discussed (*see* Pretrial Conf. Transcript ("P.C. Tr.") 4:3-17, Doc. 264).

Plaintiff's suggestions/accusations that the Court is responsible for Mr. Frost's conduct are not supported by the record. She first contends that no accommodation was made for Mr. Frost's hearing impairment. (Doc. 278 at 28.)

On day three of the trial, the Court Deputy . . . approached Attorney Dylan Hastings and asked if Attorney Mark Frost needed hearing Aids, but said she didn't want to embarrass him by asking him; she showed Mr. Hastings where the hearing aids were kept in a closed cabinet between counsel tables. (Donna)Mr. Frost accepted the hearing aid which looked like a stethoscope and wore it the remaining day and a half of the trial. . . . The Deputy said that the hearings aids were only partially charged. . . .

Mr. Frost's hearing disability was an issue the day of the pre- trial conference, June 22, 2021. . . . (DOC 234, 3:16-25, 4:1-21) After the Court gave detailed instructions on how it wanted evidence submitted, Mr. Frost said:

> "Sorry to interrupt you. I have a hard time hearing. And pretty much what you said, I'm sorry, I could not hear." (DOC 234, 3:18-20) The Court asks if Frost needed anything for trial. Frost responds, "I'm not sure, Judge. I'm - - at this point in time I'm barely ambulatory and in and out of the hospital, operations on my lower back, left side. "(DOC 234, 4:4-6) "It's just going to be hearing, and I can - - hearing aids from the hospital are finally in, but because of COVID there was a big delay. So I'll try to get a hearing aid for the trial." (DOC 234, 4:10-13)

The court assisted hearing aid devices were not offered to Frost the first day of trial. Nor were these devices offered to Frost at any time during the first two and one half days of trial. . . . On day three, Frost wore the hearing devices which appeared to improve his performance, although not perfectly.

. . . .

This hearing disability had the effect of robbing Davis of counsel who could hear the testimony, object to evidence, know what evidence or testimony needed to be presented, guide his associate who was trying his first case in Court.

The Court's lack of an accommodation limited counsel's ability to represent Davis, created communication issues and prejudiced how her case was presented to the jury. The Court assisted hearing device would have been more useful on day 1 of trial. Counsel was deprived of an accommodation and Davis was deprived of counsel and a fair trial.

(Doc. 278 at 28-29.)

Plaintiff's attempt to place the blame on the Court misrepresents the facts and is

without merit. Following the pretrial conference dialog quoted above, the undersigned said

that "[i]n the event that you aren't able to get the hearing aid and you think that there's some

accommodation that can be made that would help you, . . . I'll be glad to do that." (P.C. Tr.

4:14-17, Doc 264.) Mr. Frost replied "thank you" to the offer (*id.* 4:18) and Plaintiff was

present when the offer was made. Despite this offer of assistance, the Court did not receive

a request for accommodation. Therefore, blame for any hearing related issue is

appropriately placed on Plaintiff and her trial counsel.[4]

---

[4] The Court notes that Plaintiff's assertion regarding the importance of Mr. Frost's hearing issues and need to guide Mr. Hastings is belied by the fact that Mr. Hastings had represented on June 24, 2021, that Mr. Frost would be "unable . . . to attend the upcoming trial" and "Plaintiff has agreed to have me serve as her lead trial counsel." (Doc. 231 ¶¶ 2, 5.) Thus, Plaintiff apparently had assessed Mr. Hastings able to handle the trial himself.

The Court further notes that Plaintiff's characterization of the undersigned's demeanor during closing argument is inappropriate and inaccurate. It is inaccurate in that the undersigned was watching Mr. Hastings rather than Mr. Frost during closing argument and there was no "disapproval and disgust during Hastings's closing argument" (Doc. 278 at 30). It is inappropriate in that Plaintiff's mental impression of another's expression is without legal significance in the current context. Further, Plaintiff's related assertion that, during Mr. Hasting's closing argument, the undersigned attempted to get someone's attention, "perhaps the Marshalls stationed in the Courtroom" is factually inaccurate and, to the extent it speculates that the perceived attempt related to Mr. Frost sleeping, it is baseless. At no time did the undersigned seek to get someone's attention about Mr. Frost sleeping.

Plaintiff also criticizes Mr. Frost's representation based on his repeated violations of a written pretrial ruling (*see* Docs. 211, 212.) precluding reference during trial to the previously dismissed due process claim. (Doc. 278 at 24-25.) Plaintiff speculates that the undersigned's response to Mr. Frost's conduct prejudiced the jury. (*Id.*) The Court disagrees. Upon Mr. Bufalino's objection and request for a sidebar conference in response to Mr. Frost's improper reference to the due process claim during his cross-examination of Defendants' economics expert on the fourth day of trial, the Court instructed that the jury be taken out of the courtroom. (T. Tr. Day 4 21:1-8, Doc. 263.) After the jury left the courtroom, Mr. Bufalino expressed his frustration with the repeated violation of the Court's pretrial order and the Court firmly addressed Mr. Frost's repeated misconduct on this issue. (*Id.* 21:20-23:12.) If jurors heard the rebuke of

The same is true of any other matter for which Plaintiff now seeks to place blame on someone other than herself for Mr. Frost's trial conduct.  Clearly her current filing shows that Plaintiff was aware of Mr. Frost's hearing issue and undesirable conduct early in the case yet she chose to do nothing about them.  As discussed previously, at any point in time during the trial Plaintiff could have terminated his representation yet she chose not to do so.  Thus, Plaintiff's extreme dissatisfaction with Mr. Frost's performance is not a basis for the relief requested.

---

Mr. Frost's conduct after they left the courtroom, they would know that it had nothing to do with Plaintiff or the merits of her case and everything to do with Mr. Frost's conduct and violation of Court orders both before and during trial.  Frost was admonished for his repeated violation of these rulings and nothing more. Plaintiff's speculation as to prejudice derived from juror's possible inference related to steps taken by the Court to curb further misconduct by Mr. Frost (Doc. 278 at 25) is similarly attenuated and unavailing. Plaintiff correctly notes that no curative instruction was offered when the jury returned to the courtroom. Due to the subject matter of Mr. Frost's infractions, such an instruction could easily have been more harmful to Plaintiff's case than helpful.  (*See* T. Tr. Day 4 21:20-24, 22:1-3, 23:3-7, Doc. 263.)  Further, Plaintiff's counsel did not request a curative instruction.

Any prejudice possibly attributable to the undersigned's perceived reaction or response to anything that occurred at trial would have been alleviated by the Court's instructions to the jury. In the preliminary instructions, the Court informed the jury:

> You will hear the evidence, decide what the facts are, and then apply those facts to the law that I will give to you. You and only you will be the judges of the facts. You will have to decide what happened. I play no role in judging the facts.
>
> You should not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be.

(T. Tr. Day 1 53:8-14, Doc. 260.)

Any prejudice possibly attributable to the undersigned's perceived reaction or response to anything that occurred at trial would have been alleviated by the Court's instructions to the jury. In the preliminary instructions, the Court informed the jury:

During the jury charge following closing arguments, the Court stated: "do not assume from anything I may have done or said during the trial that I have any opinion about the issues of this case or about what your verdict should be."  (T. Tr. Day 4 124:9-11, Doc. 263.)

## C. Jury Conduct

Plaintiff's allegation of jury misconduct stems from conduct she claims to have observed on the part of jurors during Mr. Hastings' closing argument. Jurors are distracted for any number of reasons and momentary distractions during trial, which is what is alleged here (*see* Doc. 278 at 26-27) do not provide, or contribute to, a basis for a new trial.

## D. Court Error

## 1. Notebooks

Plaintiff asserts that the Court did not provide the jury with notebooks until the second day of trial thereby denying Plaintiff "the opportunity to have the jury record her testimony during her direct and cross examination." (Doc. 278 at 32.) Plaintiff concludes this deprived her of a fair trial. (*Id.* at 33.) No requests or objection related to this issue were raised at trial, and Plaintiff has not shown that, even if she is correct that notebooks were not handed out until the second day, this would be highly prejudicial such that an exception to the waiver rule would apply.

This is particularly so given the Court's instruction about the use of notes:

> If you wish, you may take notes during the presentation of evidence, during the summations of attorneys and at the conclusion of the evidence and during my instructions to you on the law. My courtroom deputy will arrange for pens and paper.
>
> Remember that your notes are for your own personal use, they are not to be given to or read by anyone else. You should not consider the notes that you or fellow jurors may take as a kind of written transcript.

34

Instead, as you listen to the testimony, keep in mind that you'll be relying on your recollection of that testimony during deliberations. Here are some other specific points to keep in mind about note-taking:

1. Note-taking is permitted, it is not required. Each of you may take notes but no one is required to take notes.

2. If you do take notes, be brief. Do not try to summarize all of the testimony. Notes are for the purpose of refreshing memory. They are particularly helpful when dealing with measurements, times, distances, identities and relationships. You must determine the credibility of witnesses, so you must observe the demeanor and appearance of each person on the witness stand. Note-taking must not distract you from that task.

3. Do not use your notes or any other juror's notes as authority to persuade fellow jurors. In your deliberations, give no more and no less weight to the views of a fellow juror, just because that juror did or did not take notes.

A juror's notes are not evidence and should not be used in place of evidence, and they are, by no means, a complete outline of the proceedings or a list of the highlights in the trial.

Your memory is what you should be relying on when it comes time to deliberate and render your verdict in this case. Do not use your notes as authority to persuade fellow jurors of what the evidence was during the trial.

(T. Tr. Day 1 62:29-63:18, Doc. 260.)

The foregoing instructions indicate that jury members were told that the courtroom

deputy would arrange for pens and paper. Therefore, if Plaintiff is correct that they were not

handed out until the second day of trial, jurors were on notice that they could have asked for

them and the courtroom deputy would provide them. Moreover, the jury was instructed

about the limitations associated with note-taking and their responsibility to rely on their

memories when deliberating and reaching a verdict. Thus, the harm associated with the possible lack of pen and paper at the beginning of the trial is minimal at most.

## 2. Jury Selection

Plaintiff contends that it was highly prejudicial that Mr. Frost did not object to Mr. Bufalino's use of peremptory challenges to strike two women from the jury. (Doc. 278 at 33.) It is Plaintiff's burden to show that an exception to the waiver rule applies and she has not done so here. Plaintiff states that two female jurors were struck for cause, one of them should not have been, and Mr. Frost should have objected to the Mr. Bufalino's use of his peremptory challenges. (*Id.*) She further asserts that this Court should find that Mr. Bufalino's intent was to deprive her of "a jury with an adequate representation of those of her peers of the same sex." (*Id.*)

Plaintiff provides no basis for the Court to make such a finding and no finding can be made on this record. While it is true that the Equal Protection Clause prohibits discrimination in jury selection on the basis of gender, or on the assumption that an individual will be biased in a particular case solely because that person happens to be a woman or a man, *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), the relevant inquiry cannot be conducted post-trial when no objection was lodged at trial. The Court explained in J.E.B.,

> [a]s with race-based *Batson* [*v. Kentucky*, 476 U.S. 79 (1986)] claims, a party alleging gender discrimination must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike. *Batson*, 476 U.S., at 97, 106 S.Ct., at 1723. When an

> explanation is required, it need not rise to the level of a "for cause" challenge;
> rather, it merely must be based on a juror characteristic other than gender, and
> the proffered explanation may not be pretextual. See *Hernandez v. New York,*
> 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

*J.E.B.,* 511 U.S. at 144–45; *see also Harden by Harden v. Allstate Ins. Co.*, Civ. A. No.

930513-SLR, 1996 WL 190013, at \*3 (D. Del. April 16, 1996) (District Court applying *J.E.B.*

in civil context).

Here the requisite inquiry did not take place because Plaintiff's counsel did not object

to Mr. Bufalino's peremptory challenges.  The Court cannot not now determine that Plaintiff

satisfies the first element of the inquiry and Defendants do not satisfy the second.

Therefore, Plaintiff does not have a basis to show that the alleged error is highly prejudicial

and the Court can find no basis for an exception to the waiver rule.

**3. Shelby Watchilla Testimony**

Plaintiff alleges that "the Court erred in allowing the testimony of Shelby Watchilla."

(Doc.278 at 34.)  Plaintiff adds that "Bufalino excused Shelby Watchilla from appearing and

wanted to produce her testimony by zoom over Davis' objection. The Court overruled the

objection, but later realized there were issues with this Zoom appearance which denied

Davis a fair trial." (*Id.* (citing T. Tr. Day 4 44:9-19, Doc. 263).)

This assertion is a misrepresentation of the record.  The Trial Transcript shows that

Plaintiff's counsel lodged an objection to Ms. Watchilla's Zoom testimony after previously

agreeing to the testimony if she could not be present.  (T. Tr. Day 3 129:21-135:17.)  The

record shows that, upon receipt of Plaintiff's motion to continue the trial (Doc. 231) on June

24, 2021, the Court convened a telephone conference (see Doc. 242) and a new trial date was set by agreement of the parties (Doc. 232). During the telephone conference, Mr. Bufalino expressed concern about Ms. Watchilla's availability to testify if the trial commenced on July 6, 2021. (Tel. Conf. Tr. 3:16-4:3, Doc. 242.) Mr. Hastings agreed to allow Ms. Watchilla to appear virtually if necessary. (Id. 4:7-9.) After lodging his objection at trial, Mr. Hastings' recollection was refreshed with the reading of the telephone conference transcript to the parties by the court reporter who was the stenographer for the June 24, 2021, telephone conference. (T. Tr. Day 3 135:3-135:19, Doc. 262.) Thereafter, Mr. Hastings again agreed to the Zoom testimony if necessary. (Id. 136:24-137:1.)

Plaintiff is incorrect when she states that the Court "later realized there were issues with this Zoom appearance which denied Davis a fair trial" (Doc. 278 at 34 (citing T. Tr. Day 4 44:9-19, Doc. 263)). In the cited Trial Transcript dialog, it became apparent during Mr. Hastings' cross-examination that Ms. Watchilla did not have her deposition testimony in front of her. (Id. 44:9-19.) However, the problem was immediately resolved, and Mr. Hastings continued his cross-examination by representing to Ms. Watchilla, as needed, what she had said in the relevant portion of her deposition and then questioning her about what he had represented. (Id. 44:21-52:1, Doc. 263.) Ms. Watchilla did not disagree with any representation made by Mr. Hastings. (Id.) Therefore, no technical or procedural problem arose in conjunction with Ms. Watchilla's virtual testimony that was not satisfactorily resolved.

Regarding use of the word "toxic," Plaintiff's counsel did not object to Ms. Watchilla's testimony on the use of the word "toxic" in describing her work-environment on direct examination. (T. Tr. Day 4 42:15-43:5, Doc. 263.)  Mr. Hastings adequately cross-examined her on the use of the term, and Ms. Watchilla confirmed that she had not used the term during her deposition. (*Id.* 45:1-14.)  Mr. Bufalino's use of the word earlier in the case is not prejudicial because, contrary to Plaintiff's assertion (Doc. 278 at 35), he did not identify Ms. Watchilla as the source of the adjective.  He first used the word in his opening statement when he said, referring to Plaintiff, that "[s]he created this toxic environment between the management and the union." (T. Tr. Day 1 86:6-7, Doc. 260.)  Other uses of the word in the opening statement are similarly general and related to the relationship between management and the unions. (T. Tr. Day 1 86:11-12, 87:12-13, 88:14-15, 90:8-9, Doc. 260.)  Notably, "toxic" was not an adjective used only by Mr. Bufalino.  David Pedri, who the Chief County Solicitor for Luzerne County at the relevant time, testified that after Plaintiff became the H.R. manager, "[i]t became an extremely toxic environment with Ms. Davis. Every single issue was continually discussed, every single grievance was a fight, and that's not only within the union but also with management." (T. Tr. Day 2 100:17-20, Doc. 261.)

Given this record evidence, Plaintiff's assertion that she was denied a fair trial based in whole or in part by the Court's allowing Ms. Watchilla to testify is without merit.

**4. Court's Evidentiary Rulings**

Plaintiff says three of the Court's evidentiary rulings were "highly prejudicial."  (Doc. 278 at 1.)  The Court will review each claimed error in turn.

*a. Plaintiff's Testimony*

The first of these alleged errors is that the Court sustained an objection made by Mr. Bufalino while Plaintiff was testifying about an exhibit related to an Unfair Labor Practice charge.  (*See* T. Tr. Day 1 123:10-11, Doc. 260.)  Referring to the document she was reviewing, Plaintiff said "[t]his was, to me, it was as if the union presented this word for word document to mean that it represented the contents of our meeting, entire contents of our meeting, which it didn't, however, whoever created this document and published this changed testimony."  (T. Tr. Day 1 124:25-125:4, Doc. 260.)  The following dialog then occurred:

> MR. BUFALINO: Objection. Move to strike.
>
> THE WITNESS: These were not the statements that were made—
>
> THE COURT: Just a moment. Your objection is and your move to strike is based on what –
>
> MR. BUFALINO: There is no foundation for what she just testified to. She's putting herself in the mind of somebody unidentified.
>
> THE COURT: Sustained. And the testimony as to someone having altered this document is stricken. You should disregard it.

(T. Tr. Day 1 125:5-15, Doc. 260.)

Plaintiff now says this was error because she was laying the foundation—she was in the meeting and she "should have been allowed to testify on what happened at the meeting that was not reflected in the notes." (Doc. 278 at 36.) Mr. Hastings did not make this or any similar argument while the Court was considering the objection.

Assessing whether this alleged error was highly prejudicial, Plaintiff clearly got her point across that she did not engage in the conduct that was attributed to her in the document under review and that information contained in the document was altered.[5] (T. Tr. Day 1 124:19-125:3, Doc. 260.) Plaintiff's denial of Mr. Bufalino's recitation of the allegedly fabricated incidents set out in the document under review were not stricken and, therefore, remained of record. (*Id.*125:13-15.)

Moreover, the asserted "critical" nature of this ruling is belied by testimony about the negative aspects of Plaintiff's relationship with the unions, including the Pedri testimony set out above. *See supra* p. 39. Therefore, even if the Court erred in ruling to strike Plaintiff's statement as to "someone having altered the document" (T. Tr. Day 1 125:13-14), the error

---

[5] The following incidents were recorded in the document under review and denied by Plaintiff:

"Donna Davis (County) raises herself up on her chair, moving slightly over the top of the conference table and states, Why don't you just shut --"

. . . .

"Donna Davis (County) says, Just get out of here. Get out. Where is Bombay, Bombay, the union steward at 911? Why isn't he here?"

(T. Tr. Day 1 124:16-24, Doc. 260.)

would not be cause for a new trial because it is highly probable that the error did not affect the outcome of the case.  *See, e.g, Goodman*, 293 F.3d at 667.

*b. Scope of Cross-Examination*

Plaintiff identifies two instances where the Court's allowance of testimony on cross-examination went beyond the scope of direct examination.  (Doc. 278 at 37.)  In the first instance, Defendant David Parsnik, the Director of Administrative Services for Luzerne County, had been called to testify by Plaintiff and was being cross-examined by Mr. Bufalino when Mr. Frost objected to testimony on the basis of it being beyond the scope of direct.  (T. Tr. Day 2 140:25, Doc. 261.)  Mr. Bufalino responded to the objection: "Your Honor, I'm attempting to save the Court some time. I agree that it probably is, but I'm clearly going to call Mr. Parsnik in our case in chief, to the extent we get there, so I just figured why not do it now." (*Id.* 141:1-4.)  The Court then stated: "All right, go ahead. I understand the point of trying to have some economy here."[6]  (*Id.* at 141:5-6.)

---

[6] Federal Rule of Evidence 611 addresses the "Mode and Order of Examining Witnesses and Presenting Evidence" and provides in part as follows:

**Control by the Court; Purposes.** The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:

**(1)** make those procedures effective for determining the truth;

**(2)** avoid wasting time; and

**(3)** protect witnesses from harassment or undue embarrassment.

Fed. R. Evid. 611(a)

Plaintiff now argues that "[t]his ruling denied Plaintiff the opportunity to present rebuttal, since Bufalino did not put his witnesses back on the stand in his case in chief. Allowing the jury to hear negative testimony in Plaintiff's case diminished [sic] effect of the Plaintiff's case in chief." (Doc. 278 at 37.)

The Court does not find that the ruling constitutes error. Plaintiff cites no authority to support the proposition that the Court erred in allowing testimony beyond the scope of direct in the circumstances presented here. The Federal Rules of Evidence address the scope of cross-examination: "Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility. The court may allow inquiry into additional matters as if on direct examination." Fed. R. Evid. 611(b). Here, Mr. Bufalino provided a reason to go beyond the scope of cross and the Court allowed it. Mr. Frost's redirect examination addressed topics raised for the first time during cross-examination (see T. Tr. Day 2 148:12-152:22, Doc. 261) so Plaintiff was not deprived of the opportunity to present rebuttal. On the third day of trial, the Court asked Mr. Bufalino about his intended witnesses and he responded:

> my thought was to request of Your Honor, so as to not duplicate the testimony and put the jurors through what would be essentially be repetition, would ask Your Honor to incorporate into our case in chief the testimony that has been of record in the Plaintiff's case in chief, with the exception to those additional witnesses.
>
> THE COURT: I think it's your right to stand on the testimony that they have given, if that's what you're telling me.
>
> MR. BUFALINO: That's what I'm saying, Judge. I don't think it would be of any

economy or efficacy for the jurors to sit through four more days of listening to what they've already heard, is what I'm really saying. I just wanted, from the record standpoint, from our case in chief and whatever burden or proofs we have in this case, I just don't want to get procedurally hung up.

THE COURT: Do you have any comment on that, Mr. Hastings?

MR. HASTINGS: Your Honor, we have no objection to that.

(T. Tr. Day 3 132:10-133:2, Day 262.)

Further, the following day when Plaintiff presented rebuttal argument, counsel did not seek further testimony from any witness who had previously testified in Plaintiff's case in chief. Finally, the ruling to allow questions on cross beyond the scope of direct could not be harmful error because the testimony would have otherwise come in during Defendants' case in chief. There is no basis to conclude that the altered sequence of the testimony made it less probable that the jury would have reached the same verdict. *Goodman,* 29 F.3d at 667.

In the second instance cited by Plaintiff, the Court made a similar ruling as to testimony beyond the scope of direct related to Defendant Lawton, and Plaintiff presumably finds it objectionable for the reasons stated above. (*See* Doc. 278 at 37.) In response to Mr. Frost's objection regarding the scope of Mr. Lawton's direct, the Court questioned why Mr. Lawton's testimony should be cut off if Mr. Bufalino was going to call him in his case in chief. (T. Tr. Day 3 53:15-17, Doc. 262.) Mr. Frost responded: "If Mr. Bufalino will be calling him in this case, you're right." (*Id.* 53:18-19.) As with Mr. Parsnik, Mr. Frost

conducted an extensive redirect examination of Mr. Lawton. (*Id.* 57-63.) Therefore, the same analysis applies to this claimed error as that applied above.

Finally, Plaintiff's statement that "[t]he Judge held Plaintiff's counsel to objections raised by Bufalino challenging questions beyond the scope of direct" (Doc. 278 at 38 (citing T. Tr. Day 3 56:10-11, 14-15, 57:11-12, 14-15, 58:1-6, 59:1-12, 60:1-8)) is irrelevant to the Court's determination on evidentiary rulings related to Mr. Parsnik and Mr. Lawton. The basis for the rulings as to these Defendants was that they would later be called to testify in Defendants' case. This was not the situation as to Ms. Schnelly's testimony during which the citations to rulings referenced by Plaintiff took place.

With this determination, Plaintiff's alleged errors related to evidentiary rulings provide no basis for the requested relief.

## V. CONCLUSION

The foregoing analysis shows that Plaintiff has not provided a basis to conclude that she is entitled to relief on any of the grounds asserted.

Plaintiff has not shown that she is entitled to a new trial under Rule 59(a) because she has not provided any basis for the court to conclude that there was error on a question of law, that there is a need to correct previous error, or that the jury's decision was against the weight of the evidence. *See supra* p. 5 (citing *Klein v. Hollings,* 992 F.2d at 1289–90).

Plaintiff has not shown that she is entitled to alteration or amendment of the judgment pursuant to Rule 59(e) because she has not shown that there has been an

intervening change in controlling law, that new evidence is available, or that there is a need to correct clear error of law or prevent manifest injustice." *See supra* p. 6 (citing *Wiest,* 710 F.3d at 128).

Plaintiff has not shown that she is entitled to relief from final judgment under Rule 60(b)(6) because she has provided no exceptional circumstances to justify such extraordinary relief. *See supra* p. 8 (citing *Coltec*, 280 F.3d at 273).

As discussed at length above, the Court finds that errors alleged are completely without merit. Notwithstanding this determination, the Court has engaged in harmless error analysis under Federal Rule of Civil Procedure 61 and concluded that, to the extent any error occurred, it was harmless. Thus, Plaintiff's alleged errors, considered singly or collectively, do not affect Plaintiff's substantial rights in that it is highly probable that the jury would have reached the same verdict absent the alleged errors. *See supra* pp. 8-9 (citing *Goodman*, 293 F.3d at 667).

Plaintiff's summary conclusions that she is entitled to relief because the great weight of the evident warrants a new trial and a new trial is necessary to prevent a miscarriage of justice (Doc. 278 at 38) are unavailing. Plaintiff asserts that the decision of the jury is clearly unsupported and unreasonable and the jurors were influenced by the errors identified in her brief. (*Id*. at 38-39.) Insofar as Plaintiff recites her alleged errors as the basis for her conclusion that the verdict was against the weight of the evidence (*see id*.),

the Court's determination that they are without merit or harmless leaves her argument

unsupported.   Plaintiff fares no better with her additional argument that

> [n]o reasonable jury could conclude that: Davis failed to prove by the preponderance of the evidence that the multiple speeches by Davis were the motivating factor in her termination; the testimony for Keezer and Paul meetings was produced by Paula Schnelly without the assistance of a recording device; the DA requested the AG investigate the wiretap before Davis sent her the letter of December 2015; that Davis did not have a reasonable belief that she was the subject of an illegal wiretap.

(Doc. 278 at 39.)

Plaintiff is mistaken as to what the jury was asked to decide in this case.  Here, the

question before the jury, set out in Question 1 of the Special Verdict Questions which

Plaintiff approved, was whether Plaintiff had proven by a preponderance of the evidence

that "Plaintiff's report of being illegally recorded and her follow-up on the status of the

investigation into that alleged crime was a motivating factor in the decision to terminate

Plaintiff's employment."  (Doc. 251 at 2.)  The jury answered "no" to Question 1 and,

therefore, ended their deliberations.  (Doc. 251 at 2, 8.)  What the jury could have

reasonably found as to how meeting testimony was produced, when the DA requested that

the AG investigate, and whether Plaintiff's belief that she was the subject of an illegal

wiretap was reasonable were not the issues that the jury was called upon to decide and are

not relevant to the inquiry into whether Plaintiff is entitled to a new trial.

Review of the trial transcripts shows that Defendants provided ample evidence from

which the jury could reasonably believe Plaintiff had not proven by a preponderance of the

evidence that "Plaintiff's report of being illegally recorded and her follow-up on the status of the investigation into that alleged crime was a motivating factor in the decision to terminate Plaintiff's employment." (Doc. 251 at 2.)

Having no basis to conclude that the jury's verdict resulted in a miscarriage of justice, *see, e.g., Williamson*, 926 F.2d 1352, Plaintiff's Motion (Doc. 265) is properly denied. A separate Order will be entered.

Robert D. Mariani
United States District Judge